United States District Court
Southern District of Texas
FILED

APR 0 6 2000

Michael N. Milby, Clerk

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

CA-C-00-128

| | | |
|---|---|---|
| READING & BATES CONSTRUCTION, | § | BANKRUPTCY |
| | § | |
| PLAINTIFF, | § | NO. 00-2014 (ADV) |
| | § | NO. 00-20338-C-11 |
| VS. | § | |
| | § | CORPUS CHRISTI, TEXAS |
| BAKER ENERGY RESOURCES, | § | FEBRUARY 11, 2000 |
| | § | 2:06 P.M. |
| DEFENDANT. | § | |
| . . . . . . . . . . . . . . . . . . . . . . . . . . .§ | | |

TRANSCRIPT OF HEARING

BEFORE THE HONORABLE RICHARD S. SCHMIDT
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES FOR:

THE PLAINTIFF:                    MR. ROBERT TORMEHLEN
                                 LEWIS, RICE & FINGERSH
                                 1010 WALNUT ST., STE 500
                                 KANSAS CITY, MISSOURI 64106

                                 MR. MICHAEL B. SCHMIDT
                                 ALSUP & ALSUP
                                 712 AMERICAN BANK PLAZA
                                 CORPUS CHRISTI, TEXAS 78476

(APPEARANCES CONTINUED ON PAGE 2)

THE COURT RECORDER:              MS. SUNNY COLLETT

PROCEEDING RECORDED BY ELECTRONIC SOUND RECORDING
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE:
GARCIA SERVICES CORP., 710 BUFFALO STREET, SUITE 210A
CORPUS CHRISTI, TX 78401, (361) 882-5753

FORM FED • PENGAD • 1-800-631-6989

2.

APPEARANCES FOR:   (Continued)

THE DEFENDANT:                      MR. HARLIN WOMBLE
                                    MR. PETE HOLZER
                                    JORDAN, HYDEN, WOMBLE
                                      & CULBRETH
                                    500 N. SHORELINE, STE 900
                                    CORPUS CHRISTI, TEXAS 78471

                                    BY TELEPHONE:
                                    MR. PHILLIP W. BECHTER
                                    SCHWARTZ, JUNELL, CAMPBELL
                                      & OATHOUT
                                    STE 2000, 900 FANNIN
                                    HOUSTON, TEXAS 77010

FORM FED   PENGAD • 1-800-631-6989

1          (The proceedings began at 2:06 p.m.)

2               THE COURT:  Be seated.  Hello?

3          MR. BECHTER:  Yes.

4               THE COURT:  All right.  Who's on the line?

5          MR. BECHTER:  Is this Judge Schmidt?

6               THE COURT:  It is.

7          MR. BECHTER:  Hi, this is Phillip Bechter, I'm a

8     lawyer in Houston.

9               THE COURT:  Okay.

10          MR. BECHTER:  Calling in to participate or be

11     available in the 2:00 p.m. regarding --

12               THE COURT:  Okay, the motion to remand?  All right.

13     So we had an emergency motion to remand from Reading & Bates

14     Construction, is that right?

15          MR. SCHMIDT:  That's correct, Your Honor.

16          MR. HOLZER:  Yes, Your Honor.  Your Honor, Pete

17     Holzer and Harlin Womble and also Shelby Jordan, who's not

18     here, for the debtor, Baker Energy Resources Corporation.

19               THE COURT:  And who is Baker Energy Resources?

20          MR. HOLZER:  Baker Energy Resources is a corpor-

21     ation, I believe it's a Texas corporation, that is a judgment

22     debtor of Reading & Bates Construction, the plaintiffs in

23     this case.

24               THE COURT:  Okay.  And this case was set for trial?

25          MR. TORMEHLEN:  Your Honor, that's correct, it was

FORM FED   PENGAD • 1-800-631-6989

1   set for trial on this coming Monday.  It's on a two-week

2   trial docket beginning next Monday.

3          THE COURT:  Set for trial where?

4          MR. TORMEHLEN:  In Houston, Your Honor, in front of

5   Judge Hancock.  And that case had been pending, has been

6   pending since 1993, and I represent the two plaintiffs in

7   that case.  It's been on file since 1993, involves 12 defen-

8   dants, one of whom is Baker Energy Resources Corporation,

9   which is the debtor.  Last Wednesday the debtor filed a

10  voluntary Chapter 11 petition and a notice removing that case

11  but the 11 other defendants in that case have not filed

12  bankruptcy.  And that case has been on file for six years.

13  It's been hotly litigated.  We've litigated that case to

14  death.  There have been three motions for summary judgment

15  filed by the defendants in that case, all of which were

16  denied by Judge Hancock, numerous discovery disputes, have

17  been numerous depositions, and the case is finally ready for

18  trial on Monday.  And we have filed an emergency motion

19  asking Your Honor to remand the case to allow it to take, to

20  allow the trial to take place on Monday, or alternatively, to

21  sever the debtor out of this case and to allow the case the

22  proceed against the non-bankrupt defendants.  And alterna-

23  tively, Your Honor, we've also filed a motion asking Your

24  Honor to dismiss the Chapter 11 petition based upon a bad-

25  faith filing.  And we believe that if you look at the facts

1   in this case, it's going to be absolutely clear that the only

2   reason this bankruptcy petition was filed was as a trial

3   tactic to further delay the State Court action and also as a

4   mechanism for forum shopping.  The trial judge up in Houston

5   has entered a number of rulings adverse to the defendants and

6   we believe that this is a tactic to forum shop and to reliti-

7   gate those same issues that have been decided once in the

8   State Court in front of Judge Hancock.  And Your Honor, the

9   facts that we believe support a finding of bad faith is that

10  this company has not been in business since 1993.  They

11  haven't had any assets since 1993 and their own schedules

12  reflect this.  Their schedules that they had filed in connec-

13  tion with their Chapter 11 petition indicate that they only

14  have assets of $129 and that they haven't had any source of

15  income for years, this is on their own schedules, and they

16  have over six-and-a-half-million dollars in liability, Your

17  Honor, and the large majority of that, over 96 percent of

18  their liabilities is the judgment that my clients have

19  against the debtor.  And by way of background, my clients

20  received a six-and-a-half-million-dollar judgment against the

21  debtor in Canada in 1992 and we have filed this action in

22  Houston seeking to set aside a number of fraudulent transfers

23  of the debtor's assets and to hold the 11 other defendants

24  liable under grounds of fraud, piercing the corporate veil, a

25  sham to perpetrate a fraud and breach of fiduciary duties.

FORM FED  ⊕  PENGAD · 1-800-631-6989

1    And I --

2              THE COURT:  So you allege that you got a judgment in

3    1992 against a company that was solvent?  Baker Energy

4    Resources Corporation?

5              MR. TORMEHLEN:  Your Honor, we received a judgment

6    in 1992 against the debtor.  All right?

7              THE COURT:  Did the debtor have 6.5 million dollars

8    at that time?

9              MR. TORMEHLEN:  No, Your Honor, at that time they

10   had approximately a million-four in assets, and what

11   happened, Your Honor, was that in April of 1992 they granted

12   a security interest in all their assets to a company by the

13   name of LLR Holding Corporation.  They granted that security

14   interest to further secure, it was granted for no considera-

15   tion and it was granted to secure the debt of a family-owned

16   entity called Baker Marine.  All these companies are related

17   to one another.  When we tried to collect our judgment in the

18   United States, they foreclosed upon the security interest,

19   transferred all the assets to another family-owned company

20   and they're engaged in exactly the same type of business as

21   they were in '93 before our judgment.  And if I may, I've got

22   a number of exhibits I think that, if you want to go into the

23   issue of the fraudulent transfer, might be helpful.

24             THE COURT:  These are your exhibits right here?

25             MR. SCHMIDT:  They are, Your Honor.

1          MR. TORMEHLEN:  That is correct, Your Honor.

2          THE COURT:  Have you seen copies of them?

3          MR. HOLZER:  I have not seen any exhibits, Your

4     Honor.

5          MR. SCHMIDT:  They're both in there.

6          MR. TORMEHLEN:  Your Honor?

7          THE COURT:  So the first one is a chart?

8          MR. TORMEHLEN:  Yes, Your Honor, and that's --

9          THE COURT:  So it's not, you're not --

10          MR. TORMEHLEN:  And that is a time line, Your Honor,

11     of the fraudulent transfer that is being asserted up in

12     Houston.  Just by way of background, I'll walk you through

13     it, if that's agreeable with the Court.  But, Your Honor, in

14     January of 1997 -- of '92 -- well, let me back up.  This, the

15     litigation in Canada was a patent-infringement lawsuit that

16     was filed in 1982.  After 10 years of litigation in Canada a

17     referee entered a recommendation that a judgment be awarded

18     against our debtor for $2,934,205 Canadian plus interest.

19     When interest was added to that judgment it was valued in

20     excess of six-and-a-half million.  In April of '92, and this

21     is the transaction that we're complaining about, in April of

22     '92 they granted a security interest, they granted a security

23     interest on all their assets in favor of LLR Holding Corpora-

24     tion.  Now, the debtor Baker Energy and LLR are all owned by

25     the same family, which is the Baker family.  In July of 1992

1   a Federal Court in Canada accepts the referee's

2   recommendation and enters a final judgment in Canada for the

3   two million-nine plus interest.  On August 4th of '92 LLR

4   declared Baker Energy in default under that security interest

5   pledging all of Baker Energy's assets and foreclosed upon

6   those assets at a foreclosure sale.  They paid approximately

7   a million-two for those assets but there was never any cash

8   going into our debtor.  Rather, LLR granted Baker Marine a

9   credit on a promissory note that Baker Marine owed to LLR.

10  And Your Honor, that is the basis of the fraudulent --

11          THE COURT:  So does Baker Marine own anything?

12          MR. TORMEHLEN:  Yes, Your Honor.  Let me show you,

13  here's a chart that we have of the relevant entities.

14          MR. SCHMIDT:  It's your Exhibit 2, Your Honor.

15          MR. BECHTER:  Your Honor, this is Phillip Bechter on

16  the phone, and I'm one of the defendants for the defendant

17  -- I'm one of the lawyers for the defendants in the removed

18  case, and Mr. Tormehlen is not giving you all the facts,

19  there are some additional facts --

20          THE COURT:  Okay, well, I'll give you a chance to

21  argue in just a second.  Let him finish his presentation and

22  then you can argue.

23          MR. BECHTER:  Yes, sir.

24          MR. TORMEHLEN:  Your Honor, this is a chart of the

25  relevant entities and at the top we've got the Baker family.

FORM FED   ●   PENGAD • 1-800-631-6989

1    We've got Larry Banker, Sr., Virginia Baker and his two sons,

2    Larry Baker, Jr. and Russell Baker.  The Baker family owns

3    100 percent of the stock of Baker Marine Corporation.  Baker

4    Marine in turn owns 100 percent of the stock in Baker Energy

5    Resources Corporation.  This is our judgment debtor.  The

6    Baker family also owns 100 percent of LLR Holding Corporation

7    which in turn is the sole stockholder of a company called

8    Berco Services, Inc.  Now, in 1992 when all this Canadian

9    litigation is going on, Baker Marine owed LLR 19 million

10   dollars.  There was a promissory note between Baker Marine

11   and LLR for 19 million dollars.  The security interest, the

12   April 22nd, '92 security interest, Baker Energy -- Baker

13   Energy never owed anything at all to LLR.  It was never on

14   any promissory notes, it was never an obligor.  Baker Energy,

15   for the very first time, after our Canadian referee's recom-

16   mendation, pledged all of their assets to LLR to further

17   secure this 19-million-dollar note.  This is the very first

18   time that Baker Energy had pledged all their assets.  Before

19   that they were totally unencumbered.  After the Canadian

20   court entered a final judgment in our favor, LLR declared

21   Baker Energy in default and foreclosed upon all their assets,

22   paid a million-two, gave a credit on a promissory note and

23   transferred them to Berco Services.  Berco -- and Baker

24   Energy was in the business of horizontal drilling.  They

25   specialized in drilling pipelines under swamps and bayous and

1    rivers.  They transferred, the assets went from LLR to Berco

2    Services.  Berco Services is engaged in exactly the same type

3    of business.  They have the same, at least a couple of years

4    ago they had the same fax number, the same telephone number,

5    the same employees, the same equipment and the same

6    customers.  Now, that is the fraudulent transfer.  This is

7    the case that we've been fighting about in Houston since

8    1993.  We have filed a fraudulent transfer action with Judge

9    Hancock, but not only have we filed a fraudulent transfer

10   action, we believe that these officers and directors and

11   these various corporate entities have committed a fraud and

12   we have separate claims against these various corporate

13   entities asking the State Court Judge to hold them liable for

14   our Canadian judgment.  And that's the case.  We have fought

15   this case to death in Houston, it's set for trial.  The case

16   law says, and we cited it in our brief, that a Bankruptcy

17   Court can dismiss a Chapter 11 petition if it deems it to

18   have been filed in bad faith.  And I'm going to go out on a

19   limb and I don't know how much of a clearer bad-faith case

20   you could have when a party on the eve of litigation, on the

21   eve of trial after six years of litigation files a Chapter 11

22   petition with no assets.  Your Honor, let me show you, this

23   is a blowup of their schedules that they filed.

24       MR. SCHMIDT:  That's the summary of schedules, Your

25   Honor, and Exhibit 3 is the petition.

1    MR. TORMEHLEN:  They admit that they have assets of

2    $129 which is not real estate or personal property, they have

3    apparently $129 in a checking account someplace, but they

4    have liabilities of $6,871,320.06, 96, 97 percent of which

5    are my client's judgments.  You know, I think this Chapter 11

6    was filed as a trial tactic.  I don't think they want to go

7    to trial, I think they're delaying it.  I don't think they

8    like Judge Hancock.  I don't think that they like the fact

9    that she's dismissed or denied three of their summary

10   judgments.  I think this is forum shopping.  And Your Honor,

11   aside from bad faith, the removal statute, which is 1452B, I

12   believe, provides that the Bankruptcy Court has the power to

13   remand any case that's been removed based upon equitable

14   grounds.  And if you take a look at the case law, there are

15   many, many cases where this is a very common tactic by

16   debtors that don't want to go through with the State Court

17   action, they file it a day or two before the State Court

18   action, and in those cases the courts have held that it's

19   appropriate and proper to remand the case to State Court, and

20   the reasons are --

21       THE COURT:  So there's already a 6.5-million-dollar

22   judgment in the Harris County Court?

23       MR. TORMEHLEN:  That --

24       MR. BECHTER:  Just recognized within the last three-

25   and-a-half months, Your Honor.  There was a long fight --

FORM FED  ®  PENGAD · 1-800-631-6989

1    this is Phillip Bechter again -- a long, protracted fight

2    over recognition of that judgment in Texas and originally a

3    Texas court refused to recognize it.  There was a reversal in

4    the Court of Appeals.  And so when Mr. Tormehlen says we've

5    been fighting for six years and hotly litigating this case,

6    that's not quite accurate.  The case was filed and it was

7    stayed at the request of Mr. Tormehlen and his firm several

8    times for two reasons:  One is this recognition procedure was

9    still going on and there was a question as to whether or not

10   this judgment, this Canadian judgment that he's talking about

11   was even going to be recognized and enforceable in Texas, and

12   that just came down in October.  Another thing is --

13          THE COURT:  Came down from where?

14          MR. BECHTER:  -- a concurrent fraudulent --

15          THE COURT:  Came down from where?

16          MR. TORMEHLEN:  Your Honor, that was the Court of

17   Appeals --

18          MR. BECHTER:  A proceeding filed against the debtor

19   by Mr. Tormehlen and his firm and the plaintiffs in Louisiana

20   which has been run to trial in favor of the debtor has been

21   upheld on appeal and there has been a denial of writ by the

22   Louisiana Supreme Court, so it's not accurate to say that

23   we've been hotly litigating this case for six years, it has

24   sat for some time and been continued many times pending this

25   Louisiana decision and also the recognition decision.

FORM FED  ®  PENGAD • 1-800-631-6989

1          MR. HOLZER:   In response to the Court's inquiry,

2     there was a separate proceeding in a different Houston court

3     whereby Reading & Bates was attempting to domesticate their

4     Canadian judgment in Texas.

5          THE COURT:   Okay.   What was the proceeding in

6     Louisiana?

7          MR. HOLZER:   There were actually two proceedings in

8     Louisiana as well, the first one being the domestication of

9     the Canadian judgment there and then there was a hotly-

10    contested lawsuit that went up and down on appeal involving

11    the identical facts and the same types of piercing the veil,

12    alter-ego, fraudulent transfer claims that are put of this

13    Houston case that took place in Louisiana, and that case was

14    finally resolved in the debtor's favor.

15         MR. TORMEHLEN:   Your Honor, there were a number of

16    garnishment actions that went up and down in Louisiana and in

17    some of the garnishment actions we prevailed and seized money

18    and some of them we didn't.   And what has happened is in the

19    Harris County Court case in front of Judge Hancock they filed

20    a motion for summary judgment alleging that the lawsuits in

21    Louisiana would act as res judicata to this Houston Harris

22    County case.   That issue was fought, we briefed it, it was,

23    you know, hotly contested and Judge Hancock denied that

24    motion.   And that's one of the reasons why I believe that

25    they're down here.   I don't know if they'll admit it but I

1  guarantee you if this case stays here, they're going to want

2  to relitigate that very issue that we fought about in front

3  of Judge Hancock, that is, whether or not the Louisiana

4  lawsuits and judgments are res judicata to this lawsuit.  And

5  if you'll look at the case law, that's one of the reasons why

6  it's proper to remand, to recognize the comity of prior deci-

7  sions and rulings by State Court Judges.  And the other

8  factors the courts look at is how familiar is the State Court

9  Judge with the parties, the issues, the disputes and the law,

10  and I submit to Your Honor that Judge Hancock knows this

11  case, she knows the parties, she's seen us for six years,

12  it's set for Monday and it ought to proceed there.

13         MR. BECHTER:  Your Honor, if I may make a couple of

14  points.

15         THE COURT:  Go ahead.

16         MR. BECHTER:  First, plaintiffs Reading & Bates

17  never prevailed on any garnishment action in Louisiana or any

18  trial.  Those were, there was one that was settled and the

19  other was resolved in our favor and upheld on appeal.  The

20  other point I want to make is that Mr. Tormehlen has pur-

21  ported to give you a history of the facts which form the

22  basis for their fraudulent transfer claims but he's left out

23  some very significant portions of those facts, one, namely,

24  that in order to understand the transactions between Baker

25  Energy and LLR it is necessary to understand the relationship

FORM FED  ®  PENGAD • 1-800-631-6989

FORM

1    and transactions between Baker Marine and an entity, an

2    outside bank called Sea First.  Okay, Sea First was Baker

3    Marine's lender for years and in March of '84 Baker Marine

4    and Sea First --

5           THE COURT:  Sea First out of Seattle?

6           MR. BECHTER:  Yes, that's correct.  That's correct.

7           THE COURT:  Go ahead.

8           MR. BECHTER:  There was a lawsuit by Sea First

9    against Baker Marine over approximately 12 million dollars in

10   loans.  And these agreements gave Sea First a security inter-

11   est in the stock of Baker Energy, the debtor, and also gave

12   Sea First the right to demand additional security under these

13   agreements.  And those security agreements with Sea First

14   were made in the, were filed in UCC filings and made of

15   record.  In 1990 Sea First, this outside bank, threatened to

16   proceed against the collateral owed by Baker Marine, includ-

17   ing the stock of Baker Energy, and negotiations ensued.  A

18   suit was filed by Sea First and eventually, on January 17th,

19   1992, a settlement was reached in which Sea First agreed to

20   accept $600,000 in cash from the personal assets of Larry

21   Baker, Jr., Larry Baker, Sr. and Russell Baker on behalf of

22   LLR.  Sea First, in that settlement, in that arm's-length

23   settlement agreed to assign all of its rights and interests

24   against Baker Marine to LLR, which was an assignment of the

25   note to a third party such that LLR was a significant part of

1   the transaction.  And the deal was structured this way and in
2   fact LLR obtained Sea First's security interest in the manner
3   that it did because there were huge tax consequences.  There
4   was a forgiveness of, the tax consequences resulted from a
5   forgiveness of 19 million dollars in debt by Sea First, and
6   as a result LLR did still, with the structuring of this
7   settlement, end up paying about $180,000 in taxes.  And so in
8   effect what you have here, Your Honor, is not, as Mr.
9   Tormehlen has stated, just simply a security agreement out of
10  the blue.  There was a lawsuit.  The security agreement was
11  originally owned by a bank in Seattle, a complete outsider,
12  and that security agreement was obtained by LLR and there was
13  a subsequent foreclosure when the Canadian court after that
14  time came down and entered the judgment that we've been talk-
15  ing about.  So it's not quite the picture that Mr. Tormehlen
16  has painted for you.  And there's been some extensive brief-
17  ing on the facts and because of this emergency motion we
18  haven't had a real opportunity to present those to the Court
19  and we'd like that opportunity, if the Court would like to
20  hear about it.  But I guess my point is that there's a lot
21  more to it than what Mr. Tormehlen has stated and we would
22  like an opportunity to present that to you.
23          THE COURT:  Well, the first question I have is are
24  you dropping the debtor out of the lawsuit?
25          MR. TORMEHLEN:  Your Honor, we would be willing to

1  do so and --

2       MR. HOLZER:  The problem is they cannot, because all

3  the claims against the third-party defendants are derivative

4  liability claims that run through the debtor and so they're

5  owned by the debtor in possession and the trustee as property

6  of the estate.  If they drop the debtor out, there's control-

7  ling authority in both the Fifth Circuit and the Texas

8  Supreme Court that they no longer have any standing to pursue

9  their fraudulent transfer/alter-ego/piercing-the-veil claims

10  against the third, the remaining defendants.  And so I guess

11  it's okay if they do that but --

12       THE COURT:  Well, if --

13       MR. HOLZER:  -- it gets them nowhere because they're

14  all derivative claims and they're all owned by the estate.

15       THE COURT:  If the debtor is in bankruptcy -- let's

16  assume this is a valid bankruptcy filing.  If the debtor is

17  in bankruptcy, all of your claims now are owned by the

18  debtor, isn't that true?

19       MR. HOLZER:  That is correct, Your Honor.

20       THE COURT:  The debtor in possession.

21       MR. SCHMIDT:  Your Honor, we --

22       THE COURT:  I mean all of the claims of the -- I

23  mean you are now a creditor of the debtor and the debtor owns

24  all of these actions of recovery against all these other

25  corporations, if there are some?

FORM FED ® PENGAD • 1-800-631-6989

1          MR. TORMEHLEN:  Your Honor --

2          MR. SCHMIDT:  Your Honor, Mike Schmidt for, also,

3    local counsel for Reading & Bates.  If I may address that,

4    Your Honor.  We would agree with the fact that may be

5    property of the estate, the causes of action, or at least a

6    great part of them, may be property of the estate, but Your

7    Honor, these folks are not going to pursue any claims against

8    their own folks.

9          THE COURT:  Well --

10         MR. SCHMIDT:  We are the estate.

11         THE COURT:  But that just means we appoint a

12   trustee.

13         MR. SCHMIDT:  That --

14         THE COURT:  I mean under normal circumstances.

15         MR. SCHMIDT:  That's probably what we need, Your

16   Honor, right now.

17         THE COURT:  Or we would appoint, or we'd convert it

18   to 7 and let the 7 trustee deal with it, but.

19         MR. SCHMIDT:  If they're willing to do that then

20   that's a different animal.  But, Your Honor, we're willing to

21   prosecute the State Court actions ex rel on behalf of the

22   estate because if you look at it, we in essence are the

23   estate, we're 96, 97 percent of the claims.

24         MR. HOLZER:  Your Honor, there's $300,000 of other

25   creditors involved in the estate, some of it running through

1    the Baker family.

2         MR. SCHMIDT:  We'll give you those numbers.  That

3    still makes us 96 percent of the estate.

4         MR. HOLZER:  And they're entitled to a fair

5    distribution.  I --

6         THE COURT:  Okay.  Well, now let's get down to

7    the --

8         MR. SCHMIDT:  Your Honor, these people can't

9    reorganize.

10        THE COURT:  Let's get down to the real problem.  The

11   real problem is that on the eve of trial a bankruptcy was

12   filed and the bankruptcy has $129 worth of assets.  Now, how

13   is there any reorganization possible for this debtor?

14        MR. HOLZER:  Well, Your Honor, the debtor is clearly

15   going to file a liquidating plan under Chapter 11 and --

16        THE COURT:  Liquidating $129?  I mean --

17        MR. HOLZER:  Your Honor, what the debtor owns is the

18   claims against the other defendants.

19        MR. WOMBLE:  We didn't attribute a value to the

20   claims.  They think they're worth six million dollars and if

21   they are worth six million dollars, we would pay 100 cents on

22   the dollar.  We didn't attribute a value to the claims

23   because, quite frankly, as independent counsel we haven't had

24   a chance to evaluate the claims and place a value on those

25   claims.  That will be one of the things that will be liqui-

Case 2:00-cv-00128   Document 2   Filed in TXSD on 04/06/2000   Page 20 of 31

1    dated.  Yes, there will be a distribution to unsecured credi-

2    tors.

3              THE COURT:  So you think your plan is that you're

4    going to litigate all of these fraudulent conveyance actions

5    against the other related corporations and collect money and

6    then pay all these claims?

7              MR. HOLZER:  We'll make an independent investigation

8    as we're required to according to the fiduciary duties that

9    my law firm has to the estate as trustees and debtors in

10   possession.

11             THE COURT:  And --

12             MR. HOLZER:  If we determine that they should be

13   pursued and are worth pursuing, we will pursue those claims.

14   If we determine otherwise, we'll settle them or do what we

15   have to do to make a fair and just distribution to all the

16   creditors of this estate, and we take that obligation

17   seriously.

18             MR. TORMEHLEN:  Your Honor, if I may.  I truly

19   believe this, that counsel for the debtor, I believe were

20   hired by Baker Marine Corporation.

21             MR. HOLZER:  That's not correct.

22             MR. TORMEHLEN:  Because Baker Energy Resources

23   Corporation does not have any assets whatsoever other than

24   $129 and their schedules reflect that counsel's attorney's

25   fees are $20,000.  Okay?  And if you look at the schedules --

1          THE COURT:  So where did you get your retainer?

2          MR. HOLZER:  It came from the debtor, Your Honor.

3          THE COURT:  And where did the debtor get it?

4          MR. HOLZER:  I believe the debtor did borrow the

5    money from one of the other entities.

6          MR. TORMEHLEN:  On the schedules there's reflected

7    that Baker Marine Corporation is owed $18,900 for an inter-

8    company transaction in January of 2000, so my assumption is

9    is that that represents the $20,000 in attorney's fees.

10         MR. HOLZER:  I believe that's right.

11         MR. TORMEHLEN:  And I don't think that counsel hired

12   by Baker Marine is going to be able to pursue these claims.

13   I mean --

14         THE COURT:  Okay, but that's not the issue though,

15   really, because if they aren't then we appoint a trustee, I

16   mean while they're in bankruptcy, assuming that there is some

17   real bankruptcy issue here and, like you say, the bankruptcy

18   shouldn't be dismissed.  But let's get down to the practical

19   problem.  And I, when Mr. Schmidt called me about getting a

20   setting on these, that was the, I addressed the practical

21   problem, and that is, if I enter an order of remand today, it

22   won't be final for 10 days.

23         MR. TORMEHLEN:  Your Honor, we have been discussing

24   with Jana, Judge Hancock's scheduling clerk, okay, we are

25   number two on a two-week docket beginning Monday.  Judge

1    Hancock is going to be flexible about this thing, she's got a

2    number one setting that's supposed to start Monday, it's

3    scheduled for two, three, four days maybe, and she's got all

4    of the following week of the 21st open.  And we also have

5    every reason to believe if it was remanded she would -- we're

6    asking for a bench trial in front of Judge Hancock.  We're

7    estimating two to three days in front of her.  We believe her

8    schedule is flexible and she can fit us in.

9         MR. HOLZER:  Your Honor, I have a case I'd like to

10    give to the Court.  I've given opposing counsel a copy.  It's

11    a 1999 Texas Supreme Court decision, Douglas versus Dell.

12    I've highlighted briefly for Your Honor the relevant por-

13    tions.  It basically follows the Fifth Circuit law that, and

14    it says that due to the bankruptcy, because these are all

15    derivative claims, the plaintiffs have no standing in the

16    Texas State Courts to pursue their claims.  Now, the trial

17    court may not understand that but an inevitable result of a

18    remand of this case is going to be a dismissal for lack of

19    standing on behalf of these plaintiffs.

20         MR. SCHMIDT:  Your Honor, that's easily solved

21    because we're announcing and willing to prosecute the claims

22    ex rel on behalf of the estate and will seek approval of this

23    Court to so do.

24         MR. WOMBLE:  Your Honor, to do that they've got to

25    make a demand and we've got to reject the prosecution of

1  them.  We're not going to reject the prosecution of them,

2  we're going to prosecute them.  And to suggest that we're not

3  I think is just absolutely fallacious.  The fiduciary duty

4  that we have accepted by taking on this responsibility is a

5  very serious one.  I guarantee you, if we decide we won't,

6  we'll tell them.  We're going to prosecute them.  This is how

7  to pay our creditors, including these people, all of our

8  creditors.  The difference is, through the bankruptcy all of

9  them get that.

10       MR. SCHMIDT:  Your Honor?

11       MR. WOMBLE:  And we are in a unique position to do

12  just that.  Historically, all of the 11, all of the defen-

13  dants have agreed to join in the motion to remove.  We've got

14  total agreement there.  They used to all be represented by

15  the same lawyer.  That is no longer the case anymore.  The

16  debtor is independent and the debtor is now the plaintiff.

17  It's the only legal plaintiff that there is as a matter of

18  law.  We are willing to go forward with this suit and will go

19  forward with this suit.  All the stuff that's been done in

20  the State Court, Your Honor, we don't have to do any more

21  depositions, we don't have to do any more discovery.  Basi-

22  cally we've had a Magistrate that prepared it for trial, a

23  two-week trial, set it on the docket, Your Honor.  We will

24  try this case whenever this case, whenever the Court has it.

25  We're the plaintiffs now.  That is an artifact of the moti-

1    vation to file bankruptcy and that's to protect all the

2    creditors from one aggressive creditor getting everything.

3    That's why we're here, because that's what would have

4    happened if we hadn't have filed it.

5         MR. SCHMIDT:  Your Honor, I don't doubt for a minute

6    that Mr. Womble will make an independent evaluation but it's

7    not really his evaluation that's crucial here; it's the

8    insiders, they're the debtors in possession, they're in

9    control here, not the lawyers, and this Court has to believe

10   that these insiders are going to sue themselves and prosecute

11   that suit with a vengeance.  It's not going to happen, Judge.

12   Throughout the whole history of this case, as I understand it

13   from Mr. Tormehlen, they have always denied, the debtor has

14   always denied and vigorously denied and fought the existence

15   of the fraudulent transfer.  Yes, we haven't made a demand

16   upon them because they just filed bankruptcy, but the law

17   does not require us to do a fruitless and futile thing, which

18   is to make a demand that they prosecute the suit.  They're

19   not going to do it, Your Honor.

20        THE COURT:  All right.  Can we hear from the gentle-

21   man on the phone, anything further you wanted to say?

22        MR. BECHTER:  No, Your Honor, it sounds like it's a

23   bankruptcy issue and I'll leave that to bankruptcy counsel.

24        THE COURT:  All right.  I'm going to take a short

25   break.

1     (Recess at 2:37 p.m. until 2:52 p.m.)

2                              RULING

3          THE COURT:  Be seated.  Well, I have looked at the

4     schedule, I've looked at the statement of claims and I've

5     looked at the case law that's been submitted as well as the

6     debtor's response.  Under the current situation as it exists,

7     we have what I think is in essence a two-party dispute.

8     Although there are a bunch of other parties that are involved

9     in this dispute, the dispute between Baker Energy Resources,

10    the debtor, and Reading & Bates Construction Co. and Reading

11    & Bates Horizontal Drilling, with respect to this -- in other

12    words, if you look at the debtor's schedules, he's got basi-

13    cally one creditor as well as the potential of a major law-

14    suit against all of these other parties for recovery of

15    assets.  And if there were a bunch of other creditors for

16    which that would benefit, then the concept of a limited pool

17    of assets and a bunch of creditors fighting among themselves

18    to go after that, it makes sense for there to be a bankruptcy

19    and there would be a purpose of the Code that would be

20    fulfilled by a bankruptcy.  When you have one creditor, then

21    the Bankruptcy Code has a tendency to basically turn on its

22    head the actions that are pending.  There is no question that

23    while the debtor is in bankruptcy the debtor owns the actions

24    for fraudulent conveyance, basically, that are being asserted

25    by Reading & Bates Construction Co.  I am always reluctant to

1   the argument that bankruptcy was filed on the eve of trial or

2   bankruptcy was filed on the eve of foreclosure.  All bank-

3   ruptcies are filed on the eve of something.  It may well be

4   trial, it may well be foreclosure, it may well be, you know,

5   that a car was repossessed, whatever, but it certainly is

6   true that in this particular case there was a lawsuit pending

7   and the bankruptcy has had the effect of totally changing the

8   situation in the lawsuit.  With a debtor that has basically

9   no assets other than this lawsuit and no creditors, there are

10   some insider creditors and maybe a lawyer creditor but other

11   than that no creditors other than this one creditor, it seems

12   to me that under those circumstances this is basically a two-

13   party dispute, that the appropriate disposition of this

14   particular case is that the case ought to be dismissed and

15   that the lawsuit ought to be remanded.  I think that it's

16   very likely that a motion to reconsider will be filed and

17   that then we'll have to have a hearing on the motion to

18   reconsider and then once we've reconsidered there will be a

19   final order.  Whether there will be a, I doubt that there

20   will be an appeal but there will be an order at that point

21   that will have to be final, and when we get to that point, I

22   don't know that the case will go back to State Court in time

23   for there to be a hearing in State Court.  I mean that's just

24   one of the things that happens.  Quite honestly, too, I don't

25   know what would be the answer.  This case could get really

1    complicated if one of those other corporations filed

2    bankruptcy.  I don't know what the impact of a six-million-

3    dollar judgment on one of those other corporations, because

4    if one of those other corporations files bankruptcy, then

5    we've got both sides of this, I mean, could end up being

6    bankrupt and then you've got all -- and those may have real

7    creditors, I don't know.  So any number of things might

8    happen.  I am, as I had indicated, I am a little bit -- it

9    may happen that it gets back in time for the Judge's

10   schedule, but I will sign a order that dismisses the bank-

11   ruptcy as being basically a two-party dispute, and prior to

12   that, of course, an order remanding the adversary.

13          MR. SCHMIDT:  I will prepare those, Your Honor.

14          THE COURT:  All right.

15          MR. WOMBLE:  Your Honor, if I may say one thing

16   before we go away.  One of the things, there are two things,

17   I guess, that I want to notice the Court of which may have

18   some impact on the final determination.  The debtor really

19   didn't come here prepared to argue a bad-faith filing issue.

20          THE COURT:  Well, and that's why I expect a motion

21   to reconsider, so.

22          MR. WOMBLE:  Because the pleading was in the

23   adversary action.  And the big flaw with that is that one

24   creditor that we're discounting here never had any notice --

25          THE COURT:  Who was that?

FORM FED  ⬤  PENGAD • 1-800-631-6989

1          MR. WOMBLE:  -- of the fact that, those lawyers --

2          THE COURT:  The lawyers in Canada?

3          MR. WOMBLE:  -- they don't have any notice of the

4     fact that there was a bankruptcy filed and all of a sudden

5     it's being dismissed by bad faith.  And Your Honor, the

6     statute says notice and hearing and at the very least before

7     this Court enters an order dismissing this bankruptcy those

8     folks ought to have the opportunity to come and tell that one

9     other creditor's side of the story.  It ought to be before

10    the Court before it takes that action.

11         THE COURT:  I fully --

12         MR. WOMBLE:  I understand the remand but, Your

13    Honor, I think --

14         THE COURT:  I fully expect -- I think that I can sua

15    sponte dismiss the bankruptcy.  I fully expect a motion to

16    reconsider and I fully expect that Mr. Schmidt will ask for

17    expedited consideration.  And under the circumstances we'll

18    probably give him expedited consideration of the motion to

19    reconsider.

20         MR. WOMBLE:  I have no problem with that, Your

21    Honor.

22         THE COURT:  And so everybody needs to prepare for

23    that, and to the extent that we need to notice other people,

24    we'll notice the other people, but.  So prepare the orders,

25    Mr. Schmidt --

1          MR. SCHMIDT:  I will.

2          THE COURT:  -- and I'll get them when I see them.

3          MR. SCHMIDT:  Your Honor, a couple of other matters.

4          THE COURT:  Yes, sir.

5          MR. SCHMIDT:  We've got exhibits and we would move

6     to admit them.

7          THE COURT:  All right.

8          MR. SCHMIDT:  Mr. Holzer said he would agree to

9     admit the summaries, if you would, for demonstrative

10    purposes.

11         THE COURT:  Well, I considered this as just charts

12    concerning what you -- I mean, I have basically looked at

13    the, I took judicial notice of the petition and that's the

14    basis of my ruling.

15         MR. SCHMIDT:  Yes, Your Honor, that's what we ask.

16         THE COURT:  Not these other charts.  Those charts

17    were used to argue.

18         MR. SCHMIDT:  Demonstrative purposes, Your Honor.

19         THE COURT:  And they're not admitted for the truth

20    of the matter stated.

21         MR. SCHMIDT:  That's correct.  And Mr. Tormehlen is

22    filing, Your Honor, a pro hac vice, motion for admission pro

23    hoc vice and we'll --

24         MR. WOMBLE:  He can do that orally, I bet you.  We

25    have no objection to him appearing, Your Honor.

FORM FED    PENGAD · 1-800-631-6989

1          THE COURT:  All right, he's in.

2          MR. WOMBLE:  None whatsoever.

3          MR. SCHMIDT:  Thank you, I'll prepare that order,

4   too.

5          MR. TORMEHLEN:  Thank you, Your Honor.

6          THE COURT:  You're welcome.

7      (The proceedings ended at 3:02 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

We certify that the foregoing is a correct transcription from the electronic sound recording of the proceedings in the above entitled matter.

_____
Janice S. Mabry

MAR 1 3 2000

_____
Judith M. Garcia

_____

FORM FED   PENGAD • 1-800-631-6989